Thomas D. Domonoske (VSB No. 35434)
Consumer Litigation Associates, P.C.
763 J. Clyde Morris Drive, Suite 1A
Newport News, VA  23601
Telephone: (540)  442-7706
tomdomonoske@earthlink.net

Jeremy S. Williams (VSB No. 77469)
KUTAK ROCK LLP
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-3500
Telephone: (804) 644-1700
Jeremy.Williams@kutakrock.com

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter |
| | ) | |
| OLIVER LAWRENCE, | ) | Case No. 17-30339 (KRH) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter |
| | ) | |
| CHAMBERLAYNE AUTO SALES & REPAIR, INC. | ) | Case No. 17-30335 (KLP) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| PETER J. BARRETT, TRUSTEE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. |
| | ) | |
| OLIVER LAWRENCE, CHAMBERLAYNE AUTO SALES & REPAIR, INC., LBKBL PROPERTIES, INC. KIM B. LAWRENCE, and AUTO CENTER HOLDINGS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

1

## COMPLAINT

Peter J. Barrett (the "Trustee"), Chapter 7 Trustee for (i) the Bankruptcy Estate of Chamberlayne Auto Sales & Repair Inc. ("CASR") and (ii) the Bankruptcy Estate of Oliver Lawrence ("O. Lawrence"), by counsel, files this Complaint pursuant to Rule 7001 of the Rules of Bankruptcy Procedure and 11 U.S.C. §§ 548 and 550 against CASR, O. Lawrence, LBKBL Properties, LLC ("LBKBL"), Kim B. Lawrence ("K. Lawrence") and Auto Center Holdings, LLC ("Auto Center" and together with CASR, O. Lawrence, LBKBL and K. Lawrence, the "Defendants").   In support thereof, the Trustee states the following:

## PARTIES

1.      On January 24, 2017 (the "CASR Petition Date"), CASR filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code in this Court.  The Trustee was appointed to administer CASR's bankruptcy estate and continues to serve as trustee in that matter.

2.      CASR was a Virginia limited liability company with its principal place of business at 2425 Chamberlayne Avenue in Richmond, Virginia (the "CASR Building").  On the CASR Petition Date, the sole member of CASR was O. Lawrence.

3.      On January 24, 2017 (the "O. Lawrence Petition Date"), O. Lawrence filed a voluntary petition for relief under Chapter 13 of the United States Bankruptcy Code in this Court.  His case was converted to a proceeding under Chapter 7 of the Bankruptcy Code on April 6, 2017.   The Trustee was appointed to administer O. Lawrence's bankruptcy estate and continues to serve as trustee in that matter.

2

4.      O. Lawrence is a resident of the Commonwealth of Virginia with an address of 12384 Mechumps Creek in Ashland, Virginia.

5.      LBKBL is a limited liability company organized under the laws of the Commonwealth of Virginia and, upon information and belief, has its principal place of business at 12384 Mechumps Creek in Ashland, Virginia.

6.      K. Lawrence is a resident of the Commonwealth of Virginia with an address of 12384 Mechumps Creek in Ashland, Virginia, and is the wife of O. Lawrence.

7.      Auto Center is a limited liability company organized under the laws of the Commonwealth of Virginia and, upon information and belief, had its principal place of business at 402-404 Westover Hills Boulevard, Richmond, Virginia (the "Auto Center Property").

## JURISDICTION AND VENUE

8.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157 (b) (2)(A), (H) and (O).

9.      This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334.

10.      This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

11.      Venue in this Court is proper pursuant to 28 U.S.C. § 1409.

12.      This Court has personal jurisdiction over all necessary parties pursuant to Rule 7004(f) of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

### The Plot to Defraud Creditors of O. Lawrence and Protect K. Lawrence

13.     K. Lawrence and O. Lawrence (collectively, the "Lawrences"), for several years, have been involved in a conspiracy that utilizes the other Defendants to perpetrate fraud upon their creditors.

14.     The Lawrences are married. Upon information and belief, K. Lawrence is a full-time pharmacist employed by a local hospital and receives a substantial income in connection therewith.   Although O. Lawrence claims to have no assets, K. Lawrence claims to have total assets of $18,455,000 with debts of $2,532,000, for a total net worth of $15,923,000.

15.     While his wife worked as a pharmacist and received a regular income, O. Lawrence managed numerous business related to the sale and repair of motor vehicles and the leasing of real property.

16.     Over the years, in connection with his ownership and management of such businesses, O. Lawrence was penalized for violating applicable laws.  O. Lawrence also accrued a substantial amount of personal and business debt.

17.     As O. Lawrence's personal debt and legal troubles mounted over the years, he and K. Lawrence implemented a plan to protect their assets.  Namely, they decided to transfer any assets of value to K. Lawrence in an effort put the assets outside the reach of O. Lawrence's creditors.  One such example is their marital home.

18.     Despite O. Lawrence's massive debt, he lives in a 7,000 sq. ft. residence with K. Lawrence, which O. Lawrence has testified may be worth as much as two million

4

dollars (the "Residence").  The Residence has substantial equity as the only known lien is a

$400,000 Deed of Trust.

19.     As his debts mounted in 2010, the Lawrences enacted the scheme and O.

Lawrence transferred his interest in the Residence to K. Lawrence without any known

consideration.  In the process, O. Lawrence allegedly forfeited hundreds of thousands of

dollars in equity in an effort to avoid those creditors with claims against him.  In exchange,

the Residence was preserved for the use of him and his family.

20.     The transfer of the Residence is only a small part of a consistent pattern of

the scheme to have K. Lawrence take title to valuable assets in which O. Lawrence

previously had an interest.  To further the scheme, the Lawrences began to form business

entities and use existing ones, including CASR, Auto Center and LBKBL, to perpetrate

their fraud.

### LBKBL is Formed to Escape O. Lawrence's Gross Legal and Financial Obligations

21.     LBKBL is primarily in the business of leasing residential real property.

LBKBL has its principal place of business at the personal residence of the Lawrences.  At

all relevant times, K. Lawrence was the sole member of LBKBL, but the day to day

business of LBKBL was conducted by or at the direction of O. Lawrence.  In fact, LBKBL

was formed by O. Lawrence, is managed by O. Lawrence and K. Lawrence has virtually

no relationship to or familiarity with LBKBL other than being listed as the member.

LBKBL was formed solely to elude the legal and financial obligations O. Lawrence

accrued during his prior businesses.

22.     Prior to forming LBKBL in his wife's name, O. Lawrence conducted his

property rental business through other business entities, including LSU, LLC and Bayou

Properties, LLC – ownership of which was not disclosed in O. Lawrence's Schedules.  The home rental business conducted by O. Lawrence (which according to O. Lawrence's testimony at his 341 meeting totaled over "1,200 properties") was rife with illegal practices, unscrupulous business dealings and suspicious activities.

23.    As a result, since the mid-2000s, area localities have cited O. Lawrence for hundreds of property maintenance violations.  O. Lawrence has been called a "slumlord" by the Richmond Times-Dispatch and the Progress Index and a "notorious Richmond landlord" by Richmond Bizsense.   In 2009, O. Lawrence was convicted of multiple property maintenance violations and ordered to serve 30 days in jail and then serve the next 40 days on house arrest in one of the dilapidated buildings used by O. Lawrence as a rental property.   In a December 2016 deposition, O. Lawrence testified: "I got probably five, six, seven hundred, maybe a thousand misdemeanors against me."   In his 341 meeting, O. Lawrence testified that he started purchasing some properties using a trust in his mother's name because of "code violations."

24.    As O. Lawrence's property rental businesses began to deteriorate and he faced lawsuits, foreclosure and increased pressure from lenders, city officials, jilted tenants and unpaid vendors, O. Lawrence walked away from his old entities and restarted his real estate business in his wife's name, using LBKBL.

25.    Upon information and belief, O. Lawrence and K. Lawrence formed LBKBL to shield the assets of O. Lawrence and the property rental business from creditors while preserving the assets for the benefit of the family.

26.    O. Lawrence admits that he runs the day-to-day operations of "his wife's" real estate business, but states that he receives no compensation.  In fact, O. Lawrence not

6

only handles the day-to-day operations – he controls the business.  It is O. Lawrence, the purported non-owner, that handles all of the company's finances, sources and negotiates the company's acquisitions and divestitures, handles the company's interactions with its counsel, communicates with the company's banks and lenders and works with the company's accountant to prepare financial records and tax returns.

27.     According to communications between LBKBL's accountant and O. Lawrence, as of the end of 2016, LBKBL owned real estate valued in excess of $2.5 million, which properties collected almost $350,000 in annual rents.

28.     Because LBKBL was formed in the name of K. Lawrence, creditors of O. Lawrence have been unable to obtain a recovery from LBKBL.  Such frustration was all part of the Lawrences' scheme to keep the properties, generate income for the family and avoid the substantial debt O. Lawrence and his businesses had accrued.

**CASR's Assets are Transferred to Protect the Family Wealth**

29.     Prior to the CASR Petition Date, CASR was in the business of selling and repairing automobiles.  According to CASR's Schedules (CASR has not filed tax returns since 2014 according to O. Lawrence), CASR had revenues of $2.6 million in 2015 and $1.5 million in 2016.

30.     CASR was originally owned by K. Lawrence.  Again, CASR was originally owned by K. Lawrence simply to avoid O. Lawrence's creditors.  In reality, CASR was O. Lawrence's business and was eventually transferred to him solely to protect K. Lawrence.

31.     The fact that O. Lawrence owned and ran CASR is not open to dispute.  In response to the question of "What are her duties as business owner?", O. Lawrence testified: "I run everything.  I do everything."  In response to the question of "Does the

7

president of the corporation [K. Lawrence] supervise you?", O. Lawrence testified: "No."
In response to the question of "Do you keep the president [K. Lawrence] informed of what
happens at the corporation?", O. Lawrence testified: "No."  Finally, in response to the
question of "How often do you sign your wife's name on documents regarding [CASR]?",
O. Lawrence testified: "All the time."  In this same testimony, when O. Lawrence was
asked "Does [K. Lawrence] even know she is president [of CASR]?", counsel for CASR
and O. Lawrence terminated the deposition of O. Lawrence because of a conflict of interest
between O. Lawrence and CASR.

32.     As a result, it is clear that K. Lawrence had no affiliation with CASR.  K.
Lawrence was the owner merely to protect O. Lawrence.  CASR, however, was dealing
with mounting legal issues of its own.

33.     Prior to the bankruptcy filing, CASR was being sued in Petersburg Circuit
Court, *Queen Harris v. Chamberlayne Auto Sales & Repairs, Inc*., Case No
730CL16000068-00.  In that action, K. Lawrence as President of CASR refused to appear
for her regularly scheduled deposition, and then failed to comply with that court's order to
appear for a rescheduled deposition on December 12, 2017.  After CASR's counsel was
given permission to withdraw, on December 15, 2016, default was entered against CASR.
A jury trial to determine the actual, statutory, and punitive damages due that plaintiff was
set for January 25, 2017.

34.     In response to financial and legal pressures, O. Lawrence and K. Lawrence
once again embarked on a scheme to move assets out of the reach of creditors.

35.     On December 16, 2016, CASR counsel's, David Spiro, sent an email
regarding the trial set for the *Harris* case that stated in part "I am writing as a courtesy to

8

let you know that I have been retained by Chamberlayne Auto to prepare and file a chapter 7 bankruptcy petition on its behalf.  The company will stop operating as soon as the petition is filed, which will be prior to the January 25 trial date referenced above.  I understand that Oliver Lawrence will be filing for chapter 7 as well."

36.    To move assets out of the reach of creditors and with the knowledge of these pending bankruptcy filings, K. Lawrence sold CASR for a purported $1,000 to O. Lawrence in December 2016 in an undocumented cash transaction.

37.    Presumably in an effort to protect K. Lawrence, CASR failed to disclose this transaction in its Statement of Financial Affairs and the Lawrences hid this transfer from CASR's accountant.

38.    In addition to hiding the corpus of the business from various creditors, the Lawrences also sought to protect the real property on which CASR operated.

39.    While CASR was in business, it operated out of the CASR Building, which was owned by O. Lawrence.

40.    As owner of the CASR Building, O. Lawrence used the property as collateral to obtain a series of personal loans from predecessors-in-interest to Union First Market Bank ("Union"). These loans included a loan made in 2003 that was refinanced for $181,000 by Union on October 29, 2008, and a second loan for $115,000 made on May 22, 2006 (collectively, the "Loans").

41.    Both Loans were purchased by CASR by agreement dated December 13, 2013, which required Union to endorse the original loans with the following "PAY TO THE ORDER OF CHAMBERLAYNE AUTO SALES AND REPAIRS INC. WITHOUT

RECOURSE OF WARRANTY, EXCEPT FOR THOSE WARRANTIES SET FORTH IN SECTION 3 OF THE NOTE PURCHASE AND SALE AGREEMENT."

42.     After CASR purchased the Loans and became a secured creditor holding the Deed of Trust on the CASR Building, the Lawrences claim that CASR, by signature of K. Lawrence, as President, then transferred those rights to K. Lawrence, individually, on December 17, 2013.

43.     The Lawrences were running CASR at the CASR Building without paying any rent to the owner, O. Lawrence. In turn, O. Lawrence was not making any payments on the Loans held either by K. Lawrence or CASR.  This was going on for at least three years prior to the CASR Petition Date.  As a result, O. Lawrence defaulted on the Loans. Such defaults were intentional.

44.     CASR had sufficient income to meet the debt service obligations on the Loans.  By not paying such debts, however, the obligations were artificially inflated and should the need arise, K. Lawrence could foreclose on the CASR Building at any time, preventing any of O. Lawrence's creditors from recognizing any equity that may have existed.   In fact, the Lawrences implemented this scheme just before the CASR Petition Date.

45.     On January 23, 2017, one day before the O. Lawrence Petition Date and the CASR Petition Date, K. Lawrence, as owner of the Loans on the CASR Property and beneficiary under the deed of trust, allegedly foreclosed on the CASR Property in an effort to complete the transfer of ownership of the property from O. Lawrence to her own name. By virtue of the foreclosure, the Lawrences attempted to ensure that the CASR Property

and any available equity would not be part of the O. Lawrence bankruptcy and would not be available to satisfy any creditors.

46.     By foreclosing on the CASR Building, the Lawrences were able to preserve the property for the purpose of implementing their newest scheme – the continued operation of the business of CASR under a new name.

47.     On October 24, 2016, the Lawrences, along with their 22 year old son, Oliver Lawrence, Jr. ("Oliver Jr."), formed RVA Auto Sales, Inc. for the purpose of continuing the business of CASR.  Then, in December 2016, just one month before the CASR Petition Date, O. Lawrence formed Chamberlayne Autos Trucks SUV Sales Inc. ("New Chamberlayne").  Each of these business were operated out of the CASR Building.

48.     Even though K. Lawrence and Oliver Jr. continued to draw salaries from CASR, the family was actively, and fraudulently, moving its auto business to New Chamberlayne.  In the months before the CASR Petition Date, New Chamberlayne's bank records show deposits in excess of $170,000.  These funds likely came from CASR, LBKBL or other related entities and according to O. Lawrence's testimony at his 341 meeting, O. Lawrence has signature authority on New Chamberlayne's bank account.

49.     Through their scheme, the Lawrences plotted a course whereby O. Lawrence allegedly became the owner (of the now bankrupt) CASR and filed a bankruptcy that would provide no recovery for its creditors.  Meanwhile, K. Lawrence would walk away from all of the debts of CASR and the CASR Building would be preserved for the benefit of the family.  At the same time, New Chamberlayne would continue the used car business in the CASR Building without interruption and under the control of O. Lawrence with its profits benefiting both O. Lawrence and K. Lawrence.

50.     Such scheming, however, was not limited to LBKBL and CASR.

## Auto Centers Become Part of the Fraudulent Scheme

51.     Auto Center is a real estate holding company owned by O. Lawrence, engaged principally in the business of renting out the Auto Center Property.  At his 341 meeting, O. Lawrence testified that Auto Center is also involved in the scheme to defraud creditors.

52.     In order to conceal the income of Auto Center from his creditors, O. Lawrence testified that he would have his brother would pick up approximately $3,500 in cash or checks from the tenant at the Auto Center Property.  Rather than depositing those funds in a bank account owned by Auto Center, the funds were delivered to O. Lawrence, who then deposited the funds into LBKBL's account at Towne Bank.

53.     Then, O. Lawrence, who has full signature authority over LBKBL as well as access to its electronic banking, would use the LBKBL account to make payments on the debts of Auto Center.  According to O. Lawrence's 341 testimony, not only does he not advise his wife of these transactions, he sometimes signs her name on checks drawn on LBKBL's bank accounts.

54.     Once again, the assets of O. Lawrence (i.e., Auto Center) are kept out of the reach of his creditors by routing funds through accounts in his wife's name.

55.     At the time of these transactions, Auto Center had a judgment outstanding against it for over $1 million.

## The Fraudulent Scheme is Both Deep and Wide

56.     O. Lawrence and K. Lawrence individually, and through their entities, operate a scheme to defraud creditors.  As part of this scheme, O. Lawrence and K.

12

Lawrence use their names and their business names interchangeably and utilize corporate assets for their own personal benefit.  In addition, the defendants disregarded corporate formalities, operated as a single enterprise, regularly referred to CASR as "Chamberlayne Auto Sales, LLC" in a way that conceals which entity is being referenced,  and committed multiple fraudulent transactions.

57.    By way of example,  and not limitation, of the fraudulent transactions engaged in the Lawrences, the Trustee refers to the following transfers, none of which were disclosed by O. Lawrence or CASR in their respective Statements of Financial Affairs:

a.)    Within the two years prior to the CASR Petition Date, CASR paid K. Lawrence $40,200 in salary even though K. Lawrence was not involved in the day to day business of CASR and was, at all relevant times, a full time pharmacist employed by a large Richmond-area hospital;

b.)    Within the two years prior to the CASR Petition Date, CASR paid LBKBL $9,000 even though CASR was ostensibly in the used car business and LBKBL's business was real property rentals;

c.)    Within the two years prior to the CASR Petition Date, CASR paid $11,063.00 to American Reliable Insurance Company for, upon information and belief, insurance premiums related to the real estate owned and leased by LBKBL;

d.)    Within the two years prior to the CASR Petition Date, CASR paid $3,800.00 to Boston National Title Agency, LLC for, upon information and belief, real estate services related to the real estate owned and leased by LBKBL;

13

e.)     Within the two years prior to the CASR Petition Date, CASR paid $2,004.00 to IPFS Corporation for, upon information and belief, services related to the real estate owned and leased by LBKBL;

f.)     Within the two years prior to the CASR Petition Date, CASR paid $37,412 to Stancorp Financial Group, Inc. for, upon information and belief, mortgage payments owed by Auto Center and paid $887 to Capital Insurance for, upon information and belief, insurance premiums owed by Auto Center;

g.)     Within the two years prior to the CASR Petition Date, CASR paid $546,935 to American Express for credit card balances in the name of K. Lawrence;

h.)     Within the two years prior to the CASR Petition Date, CASR paid $33,130 to Barclays for credit card balances in the name of K. Lawrence; and

i.)     Within the two years prior to the CASR Petition Date, CASR paid $36,984 to Sam's Club Master Card for credit card balances in the name of K. Lawrence.

## O. Lawrence Misrepresents the Facts to Detract From Discovery of the Scheme

58.     On the O. Lawrence Petition Date, despite running two multimillion dollar businesses, O. Lawrence did not have any bank accounts and stated at his 341 meeting: "I don't own anything."   In fact, on his Schedules, O. Lawrence listed his only source of income as $1,500 in family support payments.  On his Statement of Financial Affairs, O. Lawrence answered "No" in response to the question asking whether he had any "income from employment or from operating a business" during 2015-2017.  These statements were false.

14

59.     In addition, O. Lawrence reported $0 income on his 2016 tax returns.  This was also false.

60.     To hide his fraudulent activities, O. Lawrence ensured that CASR kept no formal corporate books or accounting records which would reflect its transactions and corporate actions.

61.     Instead, O. Lawrence conducted his business through sham transactions.  O. Lawrence both (i) diverted funds from his businesses, including CASR, Auto Center and LBKBL, for his own benefit or the benefit of family members complicit in this fraudulent scheme; and (ii) used his wife's name, accounts and businesses to conduct business outside the reach of the many creditors of O. Lawrence.  O. Lawrence was a signatory on all accounts of both CASR and LBKBL.  In addition, O. Lawrence regularly used credit cards that were not in his name.  In fact, during his 341 meeting, O. Lawrence had in his possession multiple credit and debit cards, in the names of K. Lawrence, LBKBL and other entities – but none in his own name.

62.     O. Lawrence presents himself as penniless, yet he is not.  He has simply moved his assets and his business out of the reach of creditors.  Documents produced in discovery show that K. Lawrence has a net worth of more than $15 million.  The proceeds from O. Lawrence's property rental business and the used car sales business have simply been diverted away from the reach of his creditors into the name of his wife and entities formed in her name.  This fraudulent scheme allows O. Lawrence and K. Lawrence to continue their luxurious lifestyle while the many debts caused by O. Lawrence's fraud, unscrupulous business practices and illegal activities remain unsatisfied.

63.     O. Lawrence and K. Lawrence have utilized various corporate entities to shield O. Lawrence's assets from his creditors and enrich themselves while valid creditor's claims remain unsatisfied.  The defendants were part of an illegal enterprise to hinder, delay and defraud the creditors of O. Lawrence and CASR.  These bankruptcy cases are part of that scheme.   Both O. Lawrence and CASR made multiple and significant misstatements in their respective Schedules and Statements of Financial Affairs.  Each of the debtors has failed to appear for at least one 341 meeting and each of the debtors has attempted to dismiss their cases when their fraud and pattern of illegality were uncovered. The time has come for the debtors and their non-debtor co-conspirators to finally account for their years of fraud and deceit.

## COUNT I

(Alter Ego/Single Business Entity)

64.     The Trustee incorporates the above-referenced paragraphs as though fully set forth herein.

65.     LBKBL and Auto Center, individually and collectively, constitute the alter ego, alias, stooge, or dummy of CASR.

66.     With regard to these entities, there is and/or has been (a) an overlapping of officers and directors, (b) common offices and mailing addresses, (c) sharing of expenses and equipment, (d) failure to follow corporate formalities, (e)  undocumented transfers of assets and funds between corporations and individuals who have interests in such corporations, (f) employees of one corporation rendering services for another, (g) one company paying the expenses of another, (h) dominion and control of one corporation by the other and/or entities who have substantial interests in such corporations, and (k)

16

undercapitalization of the corporation within the reach of O. Lawrence's creditors – CASR and Auto Center.

67.     O. Lawrence has exercised undue dominion and control over the corporate defendants and used the corporate defendants to perpetrate injustice and fundamental unfairness.

68.     Disregarding the corporate entity of LBKBL and Auto Center is necessary to promote justice and protect the rights of the creditors of CASR.

69.     Each of the corporate defendants should be accountable for the debts of CASR, as each has acted, individually and in concert, as a device or sham to disguise wrongs, obscure fraud, unduly and unjustly enrich themselves, and possibly conceal criminal conduct.

70.     The Trustee therefore asks that the corporate defendants be held accountable for the debts of CASR and that the Court deem CASR and the corporate and individual defendants to be alter egos of one another.

71.     In the alternative, the Trustee asks that this Court deem CASR, LBKBL and Auto Center to be, in fact, a single business entity and that each be jointly and severally liable for CASR's debts.

72.     The Trustee further asks that this Court find LBKBL and Auto Center liable for any and all damages that result from their actions and for any other relief the Court deems appropriate.

**WHEREFORE,** the Trustee respectfully requests that this Court enter an Order finding that CASR, LBKBL and Auto Center constitute the alter-ego of one another and that each is jointly and severally liable for the debts and obligations of the others.

17

## COUNT II

### (Piercing the Corporate Veil)

73.     The Trustee incorporates the above-referenced paragraphs as though fully set forth herein.

74.     A unity of interest and ownership exists such that the separate personalities of the corporate defendants and the individual defendants no longer exist, and treating the individual and corporate defendants as separate entities would be inequitable.

75.     The individual defendants, individually and collectively, constitute the alter ego, alias, stooge or dummy of the corporate defendants.

76.     O. Lawrence has exercised undue dominion and control over the corporate defendants and the individual defendants have used the corporate defendants to perpetrate injustice and fundamental unfairness.

77.     Disregarding the corporate entities of the corporate defendants is necessary to promote justice and protect the rights of the creditors of O. Lawrence and CASR.

78.     K. Lawrence and O. Lawrence should be held personally responsible and accountable for the debts of CASR, as each has acted, individually and in concert, as a devise or sham to disguise wrongs, obscure fraud, unduly and unjustly enrich themselves, and possibly conceal criminal conduct.

79.     As such, the Trustee asks that the Court pierce the corporate veil.

**WHEREFORE,** the Trustee respectfully requests that this Court enter an Order piercing the veil, horizontally and vertically, and holding that all of the Defendants are responsible for the debts and liabilities of others and that the Defendants be held liable for any and all damages that result from their actions and for any other relief the Court deems appropriate.

18

## COUNT III

(Substantive Consolidation)

80.     The Trustee incorporates the above-referenced paragraphs as though fully set forth herein.

81.     Substantive consolidation is an equitable doctrine that permits a bankruptcy court, in appropriate circumstances, to disregard the legal separateness of a debtor.

82.     Substantive consolidation typically results in the pooling of all liabilities and assets of the individuals and entities to be consolidated, the satisfaction of liabilities from the resultant common fund of assets, and the elimination of all duplicative inter-entity claims.

83.     The individual defendants and corporate defendants have so extensively commingled their assets and business functions, such that a total separation of the entities would be impossible or not cost effective.

84.     The individual defendants and corporate defendants have failed to keep and failed to disclose business records, nor have they maintained the necessary corporate formalities.

85.     Through a significant number of fraudulent transfers between the CASR and each of the defendants, the individual defendants are using the corporate defendants to shield fraud, hinder creditors, unduly enrich themselves, and otherwise advance an inequitable result.

86.     Based on these and other factors, substantial consolidation of the corporate and individual defendants is necessary to ensure the equitable treatment of all creditors.

**WHEREFORE** the Trustee respectfully requests that this Court enter an Order whereby this Court exercises its equitable powers and substantially consolidates the

19

corporate and individual Defendants, pools the assets of said Defendants, and satisfies the

Defendants' liabilities and obligations from the pooled funds.

## COUNT IV

(Avoidance of Fraudulent Transfers - 11 U.S.C. § 548)

87.    The Trustee incorporates the above-referenced paragraphs as though fully

set forth herein.

88.    CASR's transfer of assets as set forth in paragraph 57 above (the

"Fraudulent Transfer(s)") were all made within two years before the date of CASR's

bankruptcy filing.

89.    The Fraudulent Transfers were made to or for the benefit of LBKBL, K.

Lawrence and/or Auto Center.

90.    The Fraudulent Transfers were made with an actual intent to hinder, delay

and defraud the creditors of CASR.

91.    The consideration CASR received in exchange for the Fraudulent Transfers

was non-existent, inadequate and/or less than a reasonably equivalent value for such assets.

At the time of the Fraudulent Transfers, CASR was insolvent and/or became insolvent as a

result of the transfers.

92.    At the time each Fraudulent Transfer was made, each recipient knew or

should have known that the consideration for such transfer was inadequate and less than a

reasonably equivalent value for such assets, and that such transfer was made while CASR

was insolvent or would make CASR insolvent.

93.    These transfers were not made in good faith.

20

94.    The Fraudulent Transfers are fraudulent transfers pursuant to 11 U.S.C. § 548 and the Trustee is entitled to an immediate turnover of any such property transferred or its money equivalent.

**WHEREFORE**, the Trustee respectfully requests that this Court enter an Order to avoid Fraudulent Transfers set forth herein pursuant to 11 U.S.C. § 548, that it order the beneficiaries of such transfers, to immediately turnover such assets, or alternatively that it enter a money judgment pursuant to 11 U.S.C. § 550 for the value of such assets in an amount to be determined at trial of this action.

## COUNT V

(Avoidance of Fraudulent Transfers - Va. Code Ann. § 55-80; 11 U.S.C. § 544)

95.    The Trustee incorporates the above-referenced paragraphs as though more fully set forth herein.

96.    The transfers aforesaid were made with an actual intent to hinder, delay and defraud the creditors of CASR.

97.    These transfers were made in reckless disregard for the rights of CASR's creditors, and were made for the purpose of leaving CASR insolvent without the ability to pay its debts as they came due.

98.    The consideration CASR received in exchange for the asset transfer was nonexistent, inadequate and/or less than a reasonably equivalent value for such assets.

99.    At the time the transfers were made, the recipients knew or should have known that the consideration for the transfers was nonexistent, inadequate and/or less than a reasonably equivalent value for such assets.

100.    These transfers were not made in good faith.

21

101.    The transfers set forth are fraudulent transfers pursuant to Va. Code Ann. § 55-80.

**WHEREFORE,** the Trustee respectfully requests that this Court enter an Order pursuant to 11 U.S.C. § 544 to avoid as fraudulent the transfers set forth herein pursuant to Va. Code Ann. § 55-80 and that it order the beneficiaries to immediately turnover such assets, or alternatively that it enter a money judgment pursuant to 11 U.S.C. § 550 for the value of such assets in an amount to be determined at trial of this action.

<u>**COUNT VI**</u>

(Avoidance of Voluntary Conveyance - Va. Code Ann. § 55-81;  11 U.S.C. § 544)

102.    The Trustee incorporates the above-referenced paragraphs as though more fully set forth herein.

103.    This Count is plead in the alternative to Count V to the extent that this Court declares that that the transfers were for an adequate consideration.

104.    At the time of these transfers, CASR was insolvent in that it was unable to meet its debts and obligations as they matured or came due, or in the alternative, the transfer of assets left CASR without any assets with which to meet its debts and obligations as they came due.

105.    Such transfers, made while CASR was insolvent or were made such that they rendered CASR insolvent, are voidable pursuant to Va. Code Ann. § 55-81.

**WHEREFORE,** the Trustee respectfully requests that this Court enter an Order pursuant to 11 U.S.C. § 544 to avoid the transfers set forth pursuant to Va. Code Ann. § 55-81 and that it order the beneficiaries to immediately turnover such assets, or alternatively that it enter a money judgment pursuant to 11 U.S.C. § 550 for the value of such assets in an amount to be determined at the trial of this action, plus interest at the

22

judgment rate from the date of judgment until paid, the Trustee's costs and expenses, including a reasonable attorney's fee, and any other relief as this Court may deem just.

## **COUNT XVIII**
(Breach of Fiduciary Duty)

106.    The Trustee incorporates the above-referenced paragraphs as though more fully set forth herein.

107.    Until one month before the CASR Petition Date, K. Lawrence was at all times relevant the sole officer and director of CASR.

108.    By virtue of the status as an officer and/or director of CASR, K. Lawrence was in a fiduciary relationship with CASR and owed it the duty of good faith, fair dealing, and acting in the best interests of the corporation.

109.    K. Lawrence breached those duties in that she failed to act in the corporation's best interests and instead acted in her own interests.  By way of example, K. Lawrence and O. Lawrence have converted money that rightfully belonged to CASR for their own personal use and for the use and benefit of other companies controlled by them. Additionally, K. Lawrence allowed O. Lawrence to run the company without any oversight, allowed him to sign her name to legally binding documents without referencing any Power of Attorney, and allowed the company to be run in violation of Virginia laws that regulate motor vehicle dealers.

110.    As a result of those breaches, and others, CASR has been damaged.

111.    As a result of the various breaches of fiduciary duties, CASR has been stripped of valuable assets which the Trustee could have used to administer the bankruptcy estates of the companies.

23

**WHEREFORE**, the Trustee respectfully requests that this Court enter an Order of Judgment against K. Lawrence, in amount to be determined at trial, plus punitive damages, plus interest at the judgment rate from the date of judgment until paid, plus his costs expended, including a reasonable attorney's fee.

**PETER J. BARRETT, TRUSTEE**

By: /s/ Jeremy S. Williams

Thomas D. Domonoske (VSB No. 35434)
Consumer Litigation Associates, P.C.
763 J. Clyde Morris Drive, Suite 1A
Newport News, VA  23601
Telephone: (540)  442-7706
tomdomonoske@earthlink.net

Jeremy S. Williams (VSB No. 77469)
KUTAK ROCK LLP
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-3500
Telephone: (804) 644-1700
Jeremy.Williams@kutakrock.com

4835-5283-7723.2